# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40478 (f rev)**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Brian D. HOWARD**
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary
*Upon Further Review*

Decided 21 November 2025

———————————

*Military Judge*: Jennifer E. Powell.

*Sentence*: Sentence adjudged 28 October 2022 by GCM convened at Misawa Air Base, Japan. Sentence entered by military judge on 7 December 2022: Dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Matthew L. Blyth, USAF; Major Megan R. Crouch, USAF.

*For Appellee*: Colonel Gary M. Osborn, USAF; Colonel Matthew D. Talcott, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Vanessa Bairos, USAF; Mary Ellen Payne, Esquire.

Before DOUGLAS, MASON, and KUBLER, *Appellate Military Judges*.

Senior Judge DOUGLAS delivered the opinion of the court, in which Judge MASON and Judge KUBLER joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

DOUGLAS, Senior Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of one specification of assault upon a superior commissioned officer, one specification of willfully disobeying a superior commissioned officer, one specification of assaulting a superior noncommissioned officer, and three specifications of dereliction of duty, in violation of Articles 89, 90, 91, and 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 889, 890, 891, and 892.[1,2] The members sentenced Appellant to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1.[3,4] The convening authority took no action on the findings or sentence.

Appellant raises seven issues on appeal, which we have reordered and rephrased: whether (1) the trial judge abused her discretion when she denied challenges for cause against two panel members; (2) Appellant's disobedience of orders and dereliction of duty convictions are factually insufficient and two of his dereliction of duty convictions are legally insufficient; (3) the trial judge erred when she refused to instruct on lack of mental responsibility; (4) the omission of court member selection sheets requires relief or remand for correction; (5) Appellant is entitled to sentence relief because of a 223-day delay between announcement of the sentence and docketing with the court; (6) as applied to Appellant, 18 U.S.C. § 922 is unconstitutional; and (7) Appellant's assault and insubordinate conduct convictions are legally insufficient.[5] We also considered one additional issue not raised by Appellant identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (8) whether we can reliably reassess Appellant's sentence.

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] In the same trial, members acquitted Appellant, consistent with his pleas, of willful dereliction of duty for failure to board Flight JL154, but guilty of the lesser included offense of negligent dereliction for failure to board this same flight, in violation of Article 92, UCMJ, 10 U.S.C. § 892. Additionally, the convening authority dismissed without prejudice two specifications of violation of Article 128, UCMJ, 10 U.S.C. § 928.

[3] The Statement of Trial Results and the entry of judgment describe this part of the sentence as "Forfeitures of Pay and/or Allowances: Total Forfeitures." Appellant claims no prejudice from this irregularity, and we find none.

[4] Appellant was credited with 164 days of pretrial confinement.

[5] Appellant personally raised issues (6) and (7) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

We have carefully considered issue (4). We do not find this issue requires discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *United States v. Grenald*, 2016 CCA LEXIS 414 (A.F. Ct. Crim. App. 14 Jul. 2016) (unpub. op.).

We have carefully considered issue (6) and find it also does not warrant discussion or relief. *See Matias*, 25 M.J. at 361; *see also United States v. Johnson*, __ M.J. __, No. 24-0004, 2025 CAAF LEXIS 499, at *13–14 (C.A.A.F. 24 Jun. 2025) (holding Courts of Criminal Appeals lack "authority to modify the [18 U.S.C.] § 922 indication" in the entry of judgment).

We have combined our review and analysis of Appellant's issues (2) and (7) because they both relate to the legal and factual sufficiency of Appellant's convictions. With respect to Specification 2 of Charge V, we determine Appellant's conviction of negligently failing to board Flight JL154 in violation of Article 92, UCMJ, is legally and factually insufficient. The Government charged this offense as failure to board Flight JL154, but failed to prove the flight number. We therefore set aside the finding of guilty to Specification 2 of Charge V, and dismiss that specification with prejudice. As to the remaining findings, we find no error that materially prejudiced Appellant's substantial rights, and therefore we affirm. We reassess the sentence for the remaining specifications for which we affirm the findings of guilty.

## I. BACKGROUND

In March of 2022, Appellant was still assigned to his first duty location, Misawa Air Base (AB), Japan. He was a heavy equipment operator by training but was moved to work in his unit's command section. Appellant's commander, Lieutenant Colonel (Lt Col) CT, initiated Appellant's discharge due to minor disciplinary infractions. By early April 2022, Appellant's discharge was approved, and he received his discharge orders. He was ordered to return to the continental United States (CONUS) by his date of separation, which was set for 13 May 2022. His first sergeant, Master Sergeant (MSgt) AM, assumed responsibility to help Appellant prepare for his impending separation.

However, from 4 April 2022 through 11 May 2022, Appellant was charged with failing to out-process. And on 12 May 2022, Appellant was charged with failing to board his departure flight. After he missed this first flight, his departure flight was rescheduled.

On 17 May 2022, the day of Appellant's rescheduled departure flight, Appellant's commander and first sergeant knocked on the door of his dorm room, directing him to gather his personal belongings, and to go to the airport. Appellant initially agreed, but then he became agitated and slammed the door shut.

Suspecting danger, the two began to run. Appellant opened his door, yielded a folding pocketknife, with the three-and-a-half-inch blade extended, and swiftly chased them through an interior hallway, down a flight of stairs, and through a ground floor hallway, outside to the adjacent parking lots. This chase was video-recorded by various security cameras.

Appellant caught up to his commander, who had found refuge in the backseat of an occupied vehicle. One of the occupants spoke with Appellant briefly, as Appellant approached the vehicle, holding his hand behind his back.

Appellant returned to his dorm room, where he was met by security forces. Appellant was detained and searched for safety purposes. The pocketknife was found, folded in one of his pockets, and seized. Consequently, Appellant did not board his flight scheduled to depart on 17 May 2022.

## II. DISCUSSION

### A. Denied Challenges for Cause

#### 1. Additional Background

During voir dire at Appellant's court-martial, his trial defense counsel challenged the selection of two individuals as panel members for cause. Trial defense counsel challenged Captain (Capt) JT for implied bias and challenged Capt KB for both actual and implied bias. With both challenges, they also requested the trial judge consider the liberal grant mandate. The trial counsel opposed the challenges for cause. The trial judge denied the challenges and explained her rationale. Neither member was peremptorily challenged, and both remained on the panel for the duration of trial.

##### a. Capt JT – Implied Bias

During group voir dire, trial counsel asked, "Do any of you believe that because someone has a mental condition, illness, or diagnosis that they [sic] can never be held criminally responsible for their [sic] actions?" All members responded in the negative, including Capt JT.

During individual voir dire of Capt JT, trial defense counsel asked follow-up questions to the trial counsel's general question on criminal responsibility when a person has a mental condition, illness, or diagnosis.

> [Defense Counsel (DC):] And why, why did you answer that way, kind of talk me through your thought process?
>
> [Capt JT:] The key is, held accountable for. So, even if it was, I suppose the, the state of the person is in, the action has been performed, so there is, I suppose, accountability or consequences of that action still exists.

4

> [DC:] Okay, so regardless of the mental condition of the person at the time if they [sic] did those actions, they [sic] should be held responsible?

> [Capt JT:] Yes, according to how I, how I, yes according to —

> [DC:] Your perspective?

> [Capt JT:] Yes, thank you.

The trial judge then interjected.

> [Trial Judge (TJ)]: And if your perspective contradicted something that I, as the military judge would instruct, do you agree that you could set aside your own perspective and follow the instructions as I give you?

> [Capt JT]: Yes, because that is, I'm sorry, can you clarify that question?

> [TJ]: Absolutely. I know sometimes during [voir dire] counsel ask questions kind of, in a vacuum, and because they want to talk about different concepts that will likely come into the court itself, but you don't have the instruction[s] from the judge yet, right?

> [Capt JT]: Right.

> [TJ]: So, if your personal beliefs, in this moment, contradict in any way with how I instruct you, on how to apply the law to the facts, would you be able to set aside your personal views and follow the instructions that I give?

> [Capt JT]: Yes, yes, in this setting, yes.

At trial, Appellant's defense counsel challenged Capt JT for implied bias for, *inter alia*, confusion over "basic legal concepts." When the trial judge denied the challenge for cause, she explained she considered it on "the basis of both actual and implied bias and the mandate to liberally grant defense challenges in close cases." She explained she found Capt JT to be "honest and credible when providing answers." She found the substance of his answers to indicate he would listen to the evidence and apply the law as instructed by the court. She found no actual bias.

Under the implied bias standard, she explained that Capt JT "sometimes took longer than other members" to answer the questions of the parties, but she found he was "very deliberate and thoughtful when he was responding." Although she did not use the words "implied bias," she continued by explaining she did not find implied bias, or a close call of implied bias.

5

Combining that [deliberate and thoughtful] approach to how he responded to defense counsel's questions . . . in talking about the level of accountability for someone with a mental health condition or diagnosis, [Capt JT] physically took more time to deliberate on the questions, which demonstrated his thoughtfulness. At times, you could tell from his face he was a little bit confused; some of the questions were long, and I don't know if that was partly due to a language barrier or just some of the – some of the broad questions. However, when combining all the bases for – for challenge, this court still does not find it to be a – a close case. The court finds that based on the totality of the circumstances, an objective observer would not have substantial doubt about the fairness of the accused's court-martial panel if [Capt JT] was on the panel. Therefore, the challenge is denied.

### b. Capt KB – Actual and Implied Bias

Similar to Capt JT, Capt KB had responded in the negative to the trial counsel's general voir dire question, asking whether a person could "never" be held criminally responsible for his actions if he had a mental condition, illness, or diagnosis. And similarly, during individual voir dire, trial defense counsel asked follow-up questions, but only two follow-up questions.

[DC:] And talk me through your thought process in that question?

[Capt KB:] I don't believe that with a mental diagnosis, mental health diagnoses, that people just get a free pass on their actions.

[DC:] Do you believe that there could be a situation in which someone's mental health diagnosis is so severe that it negates their [sic] responsibility or do you believe that there is always a level of responsibility?

[Capt KB:] I believe there is always some level of responsibility, yes.

Defense counsel did not ask any other follow-up questions related to this topic. The trial judge did not interject.

At trial, trial defense counsel challenged Capt KB for actual and implied bias for "an inelastic predisposition to consider a defense, perhaps a lack of mental responsibility, or partial mental responsibility." The trial counsel opposed the challenge and explained that Capt KB also answered the trial judge's questions affirmatively indicating he would follow the judge's instructions and "would keep an open mind and consider the evidence that is presented."

When the trial judge denied the challenge for cause, she again explained she considered it on "the basis of both actual and implied bias and the mandate to liberally grant defense challenges in close cases." She explained she found Capt KB to be "deliberate, honest and credible when providing answers." She continued by explaining she did not find actual, or implied bias. Nor did she believe there was a close call when considering implied bias.

> Regarding broad terms and theories regarding negating the responsibility, [Capt KB] did not have the luxury of having the court's instructions yet. This court disagrees with the characterization that [Capt KB] has an inelastic predisposition. This court finds that there is no evidence of any inflexibility as required for that. Rather, the court finds that the trial counsel's characterization of the questions being asked in a vacuum to be more appropriate.

> Based on [Capt KB's] answers, the court finds that there is no evidence that he would not yield to the evidence presented at trial and the military judge's instructions once they're [they are] given. Therefore, the court finds no actual bias. In analyzing the defense's challenge under the implied bias standard, I looked at the totality of the circumstances viewing it objectively through the eyes of the public.

> When reviewing the questions and responses, focused on this area of questioning, and the basis for the challenge, the court's conclusions under the implied bias analysis are the same. During that interaction counsel had asked the member to make broad conclusions trying to – trying to get clarification on the level of responsibility based on the potential evidence for mental health conditions, diagnosis, et[ ]cetera. Never choosing to clarify answers, recognizing he didn't – recognizing that one of the answers was, he doesn't believe a person with a mental diagnosis has a free pass for their actions; however, he said repeatedly he would keep an open mind during all the evidence. The member did not have the luxury of having the court instructions or hearing any of the evidence. Some of these things were just broad conclusions without any follow-up.

> Based on – based on the evidence before this court, the court does not find this to be a close call, does not find that an objective observer would have a substantial doubt about the fairness of the accused's court-martial panel or that a person in the same position would be prejudice[d]. Therefore, the [D]efense's challenge of [Capt KB] is denied.

7

**2. Law**

As our superior court recently explained, "As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Urieta*, 85 M.J. 352, 356 (C.A.A.F. 2025) (quoting *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001)).

Our procedural rules identify grounds for excusing panel members for cause. Rule for Courts-Martial (R.C.M.) 912(f)(1). Specifically, a panel member "shall be excused for cause whenever it appears that the member: . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). Our superior court has held "this language encompasses the two types of bias: actual and implied." *Urieta*, 85 M.J, at 356 (quoting *United States v. Keago*, 84 M.J. 367, 371 (C.A.A.F. 2024) (citing *United States v. Miles*, 58 M.J. 192, 194 (C.A.A.F. 2003))).

"The burden of establishing grounds for a challenge exists upon the party making the challenge." *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020) (citing R.C.M. 912(f)(3)).

### a. Actual Bias

Actual bias is also known as "bias in fact." *Id.* The test for actual bias is whether a member's personal bias "will not yield to the military judge's instructions and the evidence presented at trial." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (quoting *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A. 1987)). An actual bias challenge is evaluated based on the totality of the circumstances. *United States v. Richardson*, 61 M.J. 113, 118 (C.A.A.F. 2005). "Because a challenge based on actual bias involves judgments regarding credibility, and because 'the military judge has an opportunity to observe the demeanor of court members and assess their credibility during voir dire,' a military judge's ruling on actual bias is afforded great deference." *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007) (quoting *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996)). Appellate courts will review the trial judge's ruling on actual bias determinations for abuse of discretion. *Urieta*, 61 M.J. at 357 (citing *Hennis*, 79 M.J. at 384).

### b. Implied Bias

Implied bias is "bias attributable in law to the prospective juror regardless of actual partiality." *Id.* (citing *Hennis*, 49 M.J. at 385 (quoting *United States v. Wood*, 299 U.S. 123, 134 (1936))). The test for implied bias is "'whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high.'" *United States v. Woods*, 74 M.J. 238, 243–44 (C.A.A.F. 2015)). Like actual bias, an implied bias challenge is also evaluated based on the totality of the circumstances. *Richardson*, 61 M.J. at

118. When reviewing a military judge's determination on implied bias, we apply a standard of review "that is less deferential than abuse of discretion, but more deferential than de novo review." *United States v. Peters*, 74 M.J. 31, 33–34 (C.A.A.F. 2015).

In *Keago*, our superior court explained,

> We interpret our case law as dictating a sliding standard of appellate review for implied bias challenges that falls somewhere on a spectrum between de novo and abuse of discretion based on the specific facts of the case. A military judge who cites the correct law and explains his implied bias reasoning on the record will receive greater deference (closer to the abuse of discretion standard), while a military judge who fails to do so will receive less deference (closer to the de novo standard). Accordingly, the more reasoning military judges provide, the more deference they will receive.

84 M.J. at 373 (citing *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016)).

### c. Liberal Grant Mandate

"[I]n close cases [of implied bias,] military judges are enjoined to liberally grant challenges for cause" from the defense. *Id.* (emphasis omitted) (quoting *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007)). In other words, "military judges retain their discretion to determine whether a challenge for cause constitutes a 'close case' of bias. However, when a case is close, the liberal grant mandate prohibits military judges from denying the challenge." *Id.* (footnote omitted).

### 3. Analysis

Appellant avers the trial judge erred when she denied the challenges for cause against Capt JT and Capt KB. The trial judge applied the correct law when considering the challenges for cause. Appellant did not meet his burden at trial to establish a ground for challenge. Therefore, the trial judge did not abuse her discretion when she denied the two challenges for cause regarding actual bias. We also agree with the trial judge that the bases for the implied bias challenges did not include a close call.

### a. Capt JT – Implied Bias

We review Appellant's continued challenge of Capt JT's implied bias under a standard of review "that is less deferential than abuse of discretion, but more deferential than de novo review." *Peters*, 74 M.J. at 33–34.

Here, the trial judge correctly articulated the applicable law regarding actual and implied bias. She explained her perception of Capt JT's answers, including that they were "deliberative and thoughtful." She explained that he may have taken a little bit longer to provide his answers, which she attributed primarily to his deliberate and thoughtful approach. Notably, she summarized his answers to counsel's questions, including how he agreed he would set aside his own perspective of criminal responsibility as it may apply to a person who may be diagnosed with a mental health condition, and instead follow the instructions as provided by the trial judge, in court. Under these circumstances, our standard of review moves closer to abuse of discretion. *Rogers*, 75 M.J. at 273.

The burden of establishing grounds for a challenge exists upon the party raising the challenge. R.C.M. 912(f)(3); *Hennis*, 79 M.J. at 384. Trial defense counsel's questions seeking clarification of this member's perspective on criminal responsibility for a person who may have been diagnosed with a mental health condition was provided without context, and without associating whether Appellant had been diagnosed with any mental health condition or diagnosis. Certainly, there was no information at this stage of the court-martial as to how, if at all, Appellant's mental health was relevant.

We find the trial judge did not abuse her discretion when she denied defense counsel's challenge for cause for implied bias against Capt JT. Further, we do not believe the analysis rises to a "close call" of implied bias. *Clay*, 64 M.J. at 277.

### b. Capt KB – Actual and Implied Bias

We review the trial judge's denial of Appellant's challenge for actual bias against Capt KB for abuse of discretion. *Urieta*, 61 M.J. at 357. We are mindful that a trial "judge's ruling on actual bias is afforded great deference." *Clay*, 64 M.J. at 276. We review Appellant's continued challenge of Capt KB's implied bias under a standard of review "that is less deferential than abuse of discretion, but more deferential than de novo review." *Peters*, 74 M.J. at 33–34.

Here, the trial judge meticulously articulated the applicable law regarding actual and implied bias. Further, she repeated the applicability of the liberal grant mandate to the defense challenge for implied bias. Finally, she provided a detailed analysis on the record substantiating her ruling on the denial of the challenge for Capt KB. Under these circumstances, our standard of review for implied bias moves closer to abuse of discretion. *Rogers*, 75 M.J. at 273.

Capt KB's answer, "I believe there is always some level of responsibility, yes," was a restatement of one of the choices trial defense counsel gave him in defense counsel's question. Trial defense counsel asked, "Do you believe that there could be a situation in which someone's mental health diagnosis is so

severe that it negates their [sic] responsibility or do you believe that there is always a level of responsibility?" Despite Capt KB's answer to the defense counsel's bifurcated, closed-ended question, defense counsel asked no follow-up questions. The burden of establishing grounds for a challenge exists upon the party making the challenge. *Hennis*, 79 M.J. at 384 (citing R.C.M. 912(f)(3)).

With no follow-up questions, and no context, Appellant failed to meet his burden. *Id.* Applying a standard of review closer to abuse of discretion, we do not believe the analysis rises to a "close call" of implied bias, and we find the trial judge did not abuse her discretion when she denied Appellant's challenge for cause of Capt KB on either actual or implied bias grounds.

**B. Denied Mental Responsibility Instruction**

**1. Additional Background**

At trial, Appellant's defense counsel requested instruction on the defense of lack of mental responsibility. Through their cross-examination of the government witnesses, the Defense established Appellant's coworkers and peers elevated concerns for Appellant's mental health. Appellant's commander initiated two mental health evaluations. The first resulted in no diagnosis. The second resulted in a diagnosis of non-specific bipolar disorder. Prior to trial, a "sanity board" conducted pursuant to R.C.M. 706 determined that at the time of his offenses, Appellant did not have a severe mental disease or defect and was able to appreciate the nature and quality or wrongfulness of his conduct.

At trial, the Defense called three fact witnesses. All three were clinicians who met with Appellant in the spring of 2021, one year before the offenses were committed. They consulted with each other and agreed upon a diagnosis of unspecified bipolar disorder. After local treatment was determined to be insufficient, Appellant attended an inpatient medical facility for approximately five months. However, Appellant was discharged from the medical facility and returned to duty in early 2022. Instead of bipolar disorder, Appellant was discharged with a diagnosis of behavioral disorder.

Nonetheless, during the charged timeframe, from April through May 2022, the Defense established Appellant's behavior included indications consistent with a manic state. The trial counsel objected to the requested lack of mental responsibility instruction arguing the two-part test in Article 50a, UCMJ, 10 U.S.C. § 850a, had not been met. The trial judge found the defense was not reasonably raised because the evidence presented at trial did not demonstrate that "at the time of the offenses, the accused was unable to appreciate the nature and quality or the wrongfulness of the acts, as a result of a severe mental disease or defect." Instead, the trial judge gave tailored instructions negating mens rea, as applicable to each offense.

On appeal, Appellant avers the defense of lack of mental responsibility was reasonably raised by the evidence at trial. Further, the trial judge's refusal to instruct upon his lack of mental responsibility was prejudicial error because it prevented the members from considering the affirmative defense of lack of mental responsibility.

**2. Law**

Whether the trial judge correctly instructed the court members is a question of law we review de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citation omitted). Whether the evidence reasonably raised a required findings instruction under R.C.M. 920(e) is also a question of law reviewed de novo. *United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017) (citations omitted).

Instructions on findings shall include "[a] description of any special defense under R.C.M. 916 in issue." R.C.M. 920(e)(3). Lack of mental responsibility is an affirmative defense under R.C.M. 916(k)(1). Special defenses are also called affirmative defenses. R.C.M. 916(a), Discussion. The trial judge is required to instruct the members "on the availability and legal requirements of an affirmative defense, if 'the record contains some evidence to which the military jury may attach credit if it so desires." *United States v. Hibbard*, 58 M.J. 71, 72 (C.A.A.F. 2003) (citations omitted).

An affirmative defense is "in issue" when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012) (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)). "Any doubt whether an instruction should be given should be resolved in favor of the accused." *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000) (citation omitted).

Article 50a(a), UCMJ, 10 U.S.C. § 850a(a), describes the defense of lack of mental responsibility as

> an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. Mental disease or defect does not otherwise constitute a defense.

The same defense is outlined in R.C.M. 916(k)(l)(1). A mental condition not amounting to a lack of mental responsibility under R.C.M. 916(k)(l) is not an affirmative defense. R.C.M. 916(k)(l)(2). The burden of proof is on the Appellant to demonstrate by clear and convincing evidence that the defense of lack of mental responsibility applies. R.C.M. 916(b)(2). To be found not guilty by members by reason of lack of mental responsibility, "a majority of the members

of the court-martial present at the time the vote is taken determines that the defense of lack of mental responsibility has been established . . . ." Article 50a(e)(1), UCMJ, 10 U.S.C. § 850a(e)(1).

"Where an instructional error raises constitutional implications, [we have] traditionally tested the error for prejudice using a 'harmless beyond a reasonable doubt' standard." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014) (footnote omitted) (quoting *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). This "standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020) (citations omitted).

### 3. Analysis

The trial judge had evidence that Appellant was diagnosed with an unspecified bipolar disorder in 2021, approximately one year prior to his offenses. However, after being discharged from a medical facility for inpatient treatment for this disorder, Appellant was diagnosed with a behavior disorder and returned to duty. Appellant's commander initiated a discharge, which triggered out-processing requirements and an early return to CONUS.

Prior to Appellant's scheduled departure from Japan, and during the charged timeframe, Appellant reportedly purchased a vehicle, even though he had departure tickets. Appellant "got in" MSgt AM's "face" while at the installation's travel office booking airline tickets. On the day of the rescheduled departure flight, Appellant said, "[D]on't worry, I'll be a foreigner tomorrow." And while chasing Lt Col TK and MSgt AM with his knife, MSgt AM heard Appellant make a sound like he was "barking" at them. During Appellant's interview, after being detained, the investigator described Appellant as pulling on his hair and looking like he was talking to himself. The investigator testified that while speaking with Appellant, Appellant was "hard to follow" because his thoughts appeared to be disjointed. One of his clinicians agreed these characteristics "could" indicate a manic state. But she, and the other clinicians, did not meet with Appellant during the charged timeframe, nor did they treat him. Indeed, while she did not make a legal conclusion, as a clinical professional of psychology, she had informed Appellant's commander in 2021 that she believed Appellant was still "accountable" for his behaviors.

The defense of lack of mental responsibility requires that Appellant, "at the time of the commission of the acts constituting the offense[s], . . . as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts." This affirmative defense requires a "severe" mental disease or defect, at the time of the commission of the offenses, which was not in evidence at trial. But even assuming, arguendo, Appellant was suffering from a manic episode during the charged timeframe, there was

no evidence admitted at trial that he "was unable to appreciate the nature and quality or the wrongfulness of" his actions. The fact that Appellant concealed the knife behind his back when he spoke with the vehicle occupant indicated he knew his actions were wrongful. *See United States v. Martin*, 56 M.J. 97, 109 (C.A.A.F. 2001) (relying in part on evidence of concealment to establish knowledge of wrongfulness). Here, the evidence of the affirmative defense was not reasonably raised, and therefore, instruction on it was not required. *Davis*, 76 M.J. at 229.

However, after the required instructions on the elements of the offenses, and other appropriate instructions, the trial judge did give tailored instructions explaining there was evidence negating mens rea. She stated, "The evidence in this case has raised an issue whether the accused had a mental disease, defect, or condition and the required state of mind with respect to the charged offenses." Then, with every offense, she instructed exactly how the evidence admitted could be considered regarding the mens rea elements. As an example, for willful disobedience of a lawful order from Appellant's superior commissioned officer, the trial judge instructed as follows:

> An accused, because of some underlying mental disease, defect, or condition, may be mentally incapable of having the knowledge that [Lt Col CT] was his superior commissioned officer. You should, therefore, consider in connection with all the relevant facts and circumstances, evidence tending to show that the accused may have been suffering from a mental disease, defect, or condition of such consequence and degree as to deprive him of the ability to know that [Lt Col CT] was his superior commissioned officer. The burden of proof is upon the [G]overnment to establish the guilt of the accused by legal and competent evidence beyond a reasonable doubt. Unless in light of all the evidence – unless in light of all the evidence you are satisfied beyond a reasonable doubt that the accused at the time of the alleged offenses was mentally capable of knowing that [Lt Col CT] was his superior commissioned officer, you must find the accused not guilty of those offenses.

Here, the trial judge did not commit an instructional error. But if she did, we are confident that there was no reasonable possibility that the error might have contributed to the convictions. *Prasad*, 80 M.J. at 29.

## C. Sufficiency of Convictions

### 1. Additional Background

The members convicted Appellant of six specifications: lifting up a weapon against his superior commissioned officer in violation of Article 89, UCMJ;

willfully disobeying his superior commissioner officer's orders to "pack his be-
longings and go to the Misawa Air Base Passenger Terminal" in violation of
Article 90, UCMJ; assaulting his first sergeant, a noncommissioned officer, by
chasing him with a knife in violation of Article 91, UCMJ; and twice willfully
derelict in the performance of his duties by failing to complete the require-
ments to out-process and failing to board Flight V272, and once negligently
derelict in the performance of his duties by failing to board Flight JL154, as it
was his duty to do so, in violation of Article 92, UCMJ.

Through counsel, and personally, Appellant challenges the legal and fac-
tual sufficiency of his convictions. Specific to the convictions for willfully diso-
beying his commander's order to pack his bags and go to the Misawa AB pas-
senger terminal, and willful failure to board his rescheduled departure flight
on 17 May 2022, Appellant claims he was detained, and therefore, it was im-
possible for him to comply. Specific to the convictions for failure to board both
his originally scheduled departure flight, and his rescheduled departure flight,
Appellant argues the Government failed to prove the flight numbers charged.
And specific to the convictions of lifting up a knife against Lt Col CT, and chas-
ing MSgt AM, Appellant claims he lacked mental responsibility.

### a. Duties to Out-Process, 4 April 2022 – 11 May 2022

At trial, MSgt AM explained that once Appellant received his orders to sep-
arate from the Air Force, MSgt AM met with Appellant. MSgt AM and Appel-
lant were together at the unit when Appellant was provided with a copy of his
separation orders and checklist to out-process. MSgt AM created a "gameplan"
to help Appellant accomplish his out-processing duties. The out-processing was
complicated by the fact that the installation had "an exercise week." Further,
MSgt AM explained that any first-term Airman may be challenged by the num-
ber of duties required to out-process, and in such a relatively short timeframe.
Lt Col CT explained that there were approximately 30 days from the date Ap-
pellant received his discharge orders until his effective date of separation.

At trial, MSgt AM explained in meticulous detail how he had to help Ap-
pellant out-process. First, Appellant did not turn in his issued real-world, or
training, chemical gear. MSgt AM enlisted the support of Appellant's friend,
Senior Airman (SrA) DC, to find Appellant's training gear, and turn it into the
issuing office, which SrA DC was able to accomplish. However, the "real-world"
gear was never located or turned in. Second, MSgt AM made Appellant's ap-
pointment at the finance center for him. After Appellant failed to show to his
scheduled appointment, MSgt AM provided finance with a copy of Appellant's
separation orders and his final address. MSgt AM received from finance paper-
work for Appellant's final travel voucher, which Appellant could file via mail,
upon return to CONUS. Third, MSgt AM enlisted the support of the medical
group's first sergeant to help Appellant be out-processed through them.

Fourth, MSgt AM accompanied Appellant to the travel office to acquire his original departure tickets, including all connecting flights between his duty location and his destination. Fifth, Appellant failed to show at a pre-separation appointment and failed to accomplish many other out-processing requirements. MSgt AM asked what were the "bare essentials" that were required, and either accomplished the items for Appellant, or created a memorandum for record from MSgt AM to satisfy the checklist item.

### b. Duty to Board Flight JL154, 12 May 2022

On 12 May 2022, Appellant was scheduled to depart Japan, pursuant to his separation orders. At trial, the Government admitted Prosecution Exhibit 4 (PE 4), a two-page receipt of travel tickets, which provides that Appellant's flight number leaving Japan was JL156, not JL154. During deliberations, a court member opened the court and questioned the discrepancy. Neither party requested a variance, and the trial judge referred the members back to their instructions.

Because Appellant did not board his departure flight on 12 May 2022, MSgt AM amended Appellant's date of separation to extend him in the Air Force until another departure flight could be scheduled.

### c. Duty to Board Flight V272 and Other Events, 17 May 2022

Appellant was rescheduled to depart Japan on 17 May 2022. Concerned that Appellant might miss this flight as well, MSgt AM asked Appellant's friend, SrA DC, to go to breakfast with Appellant and then help Appellant get to the airport on time, with his belongings.

SrA DC and Appellant went to breakfast. However, after breakfast, when SrA DC offered to assist Appellant get to the airport, Appellant explained that he still had to finish packing. Appellant further explained that he would be able to get himself to the airport as he had his own vehicle. SrA DC called MSgt AM and told him that Appellant was still in his room, getting ready to leave. The time was approximately 0900.

Next, MSgt AM, accompanied by MSgt MH, a person who often filled in as the unit's first sergeant, went to Appellant's room. They discussed with Appellant his required report time to the airport, that it had changed, and was now at 1100 local. MSgt MH testified at trial that he could see into Appellant's room and could see that Appellant was not packed or ready to depart. The time was between 1030 and 1045. Again, Appellant explained that he was not finished packing and that he would get himself to the airport.

Concerned, MSgt AM returned to the unit and spoke with Appellant's commander, Lt Col CT. They decided to return to Appellant's room together, and attempt to use a friendly, "fatherly" tone to encourage Appellant's departure.

The time was shortly after 1100. They knocked on Appellant's dorm room door and were greeted casually by Appellant. Both Lt Col CT and MSgt AM suggested they would take Appellant and his bags to the airport as it was past the "no later than" reporting time. Appellant told them not to "worry about it. I'll be a foreigner tomorrow." Lt Col CT did not hear Appellant initially and asked him to repeat himself. Appellant repeated himself. MSgt AM became more stern and directive in tone, saying something like, "You need to get your stuff, let's go." Appellant became agitated, and "slammed" the door. Lt Col CT discerned Appellant was "going for something in the room."

Instinctively, Lt Col CT and MSgt AM turned away from the door and began to run down the hallway. They found a stairwell in the middle of the hallway and descended to the landing. Both testified they could hear Appellant open his dorm room door and run after them. Lt Col CT heard some commotion behind him and so he stopped briefly and looked behind him. MSgt AM had slipped and fallen down a couple of stairs. Lt Col CT heard Appellant making a noise like a "grunting" sound. Lt Col CT looked up the stairwell, saw Appellant, and saw that he was "brandishing" some sort of weapon with a handle, in an aggressive manner. Lt Col CT assumed it was a knife of some kind. After verifying MSgt AM was able to get back on his feet, they both continued running. They were searching for an exit. After leaving the stairwell, they continued sprinting down the hallway until they reached an exit. At trial, the Government admitted PE 6, which was a disc containing six video clips from the various cameras inside the dormitory building capturing the events outside Appellant's dorm room door, through the end of the chase, and out of the building. In the video clips, Appellant can be seen chasing his first sergeant and commander, while clasping a knife in his right hand.

Once outside, Lt Col CT ran across the street and into the backseat of an idling vehicle. The vehicle was parked in front of the main billeting lodge on the installation. A driver was seated in the vehicle, a passenger was in the front passenger's seat, and a third passenger, unknown to Lt Col CT at the time, was inside lodging. Lt Col CT started locking all the doors and yelled at the driver to "drive now!" When the driver did not drive, Lt Col CT reached towards the front seat and attempted to put the vehicle in the drive position.

The driver and the passenger testified at trial. They were majors in the Air Force, but not stationed at Misawa AB. They were on temporary duty. The driver explained to Lt Col CT that if there was some kind of exercise, they were not participating in it. The passenger explained that he saw Appellant calmly walking up to the back of the vehicle. So, the passenger got out to speak with him. After a brief exchange, Appellant left. The passenger did not see anything in Appellant's hand but admitted Appellant's hand was behind his back.

Lt Col CT got out of the vehicle and went inside another nearby building. He called law enforcement and reported the events. MSgt AM, after exiting Appellant's dormitory building, did not follow Lt Col CT, but instead chose a different route to safety. MSgt AM also made contact with law enforcement to report the events.

At trial, the Government admitted PE 5, a travel itinerary for 17 May 2022. The flight leaving Misawa AB, Japan, on this day, was a military rotator. On the travel itinerary, the mission number is labeled, "TKCV2720A137." The showtime is listed as NET (No Earlier Than) 1135, which is crossed out and replaced with 0800. Under the NET is listed NLT (No Later Than) 1515, which is also crossed out and replaced with 1100. The record of trial does not include evidence of when these times were crossed out and replaced, or whether Appellant's copy of PE 5 included this information at the time of the incident. In the directions on the travel itinerary, there is a paragraph labeled, "Recommended Check-In Time." There, it is written that a traveler "must check-in No Later Than (NLT) 2 hours and 20 minutes prior to the scheduled departure." The trial judge also took judicial notice of the regulation that provided the same NLT information: 2 hours and 20 minutes prior to the scheduled departure. The trial judge instructed the members accordingly.

### 2. Law

#### a. Legal and Factual Sufficiency

We review issues of legal sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024) (citing Article 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "This deferential standard impinges upon the

factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, 85 M.J. 213, 217 (C.A.A.F. 2024) (internal quotation marks and citation omitted).

The factual sufficiency standard in the current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency of proof.

> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

>> (II) appropriate deference to findings of fact entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), *the Court is clearly convinced that the finding of guilty was against the weight of the evidence*, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*) (emphasis added).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weighed it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

When our factual sufficiency review includes the defense of mental responsibility "the court must weigh the evidence and determine for itself whether

appellant proved the defense of lack of mental responsibility *by clear and convincing evidence.*" *Martin*, 56 M.J. at 104.

### b. Offenses

In order to convict Appellant of assault of a superior commissioned officer, as alleged in the Specification of Charge II, the Government was required to prove: (1) that Appellant lifted up a weapon, to wit: a knife, against Lt Col CT; (2) that Lt Col CT was the superior commissioned officer of Appellant; (3) that Appellant then knew Lt Col CT was his superior commissioned officer; and (4) that Lt Col CT was then in the execution of his office. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 15.b.(2). "The term 'superior commissioned officer' means a commissioned officer superior in rank or command." *MCM*, pt. IV, ¶ 15.c.(1).

In order to convict Appellant of willfully disobeying a superior commissioned officer, as alleged in the Specification of Charge III, the Government was required to prove: (1) that Appellant received a lawful command from Lt Col CT to pack his belongings and go to the Misawa AB Passenger Terminal; (2) that Lt Col CT was the superior commissioned officer of Appellant; (3) that Appellant then knew Lt Col CT was his superior commissioned officer; and (4) that Appellant willfully disobeyed the lawful command. *MCM*, pt. IV, ¶ 16.b. "'Willful disobedience' is an intentional defiance of authority." *MCM*, pt. IV, ¶ 16.c.(2)(f).

In order to convict Appellant of assault of a noncommissioned officer, as alleged in Specification 1 of Charge IV, the Government was required to prove that: (1) Appellant was an enlisted member; (2) Appellant assaulted MSgt AM, by chasing him with a knife; (3) the assault was committed while MSgt AM was in the execution of office; (4) Appellant then knew MSgt AM was a noncommissioned officer; (5) MSgt AM was the superior noncommissioned officer of Appellant; and (6) Appellant then knew MSgt AM was his superior noncommissioned officer. *MCM*, pt. IV, ¶ 17.b.(1).

In order to convict Appellant of willful dereliction of duty for failure to complete the requirements to out-process, as alleged in Specification 1 of Charge V, the Government was required to prove: (1) that Appellant had duties to out-process; (2) that Appellant knew or reasonably should have known of the duties; and (3) that Appellant was willfully derelict in the performance of those duties. *MCM*, pt. IV, ¶ 18.b.(3). "Willfully" means intentionally. *MCM*, pt. IV, ¶ 18.c.(3)(c).

In order to convict Appellant of negligent dereliction of duty for failure to board Flight JL154, as a lesser included offense to that which was alleged in Specification 2 of Charge V, the Government was required to prove: (1) that Appellant had a duty to board Flight JL154; (2) that Appellant knew or

reasonably should have known of the duty; and (3) that Appellant was negligently derelict in the performance of that duty. *MCM*, pt. IV, ¶ 18.b.(3). "'Negligently' means an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances." *MCM*, pt. IV, ¶ 18.c.(3)(c).

In order to convict Appellant of willful dereliction of duty for failure to board Flight V272, as alleged in Specification 3 of Charge V, the Government was required to prove: (1) that Appellant had the duty to board Flight V272; (2) that Appellant knew or reasonably should have known of the duty; and (3) that Appellant was willfully derelict in the performance of that duty. *MCM*, pt. IV, ¶ 18.b.(3). "'Willfully' means intentionally." *MCM*, pt. IV, ¶ 18.c.(3)(c).

### c. Defense of Impossibility or Inability

A trial judge must instruct court members on any special defense under R.C.M. 916 that is in issue. R.C.M. 920(e)(3). "A matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose." *United States v. Rodriguez*, No. ACM 38519 (f rev), 2016 CCA LEXIS 416, *18 (A.F. Ct. Crim. App. 2016) (citing *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007) (quoting R.C.M. 920(e), Discussion)).

"Inability is a defense to disobedience to orders if the Appellant's condition made it impossible to obey the order." *United States v. Meeks*, 41 M.J. 150, 153 (C.A.A.F. 1994) (citation omitted). It is a defense to refusal, or failure to perform a duty, that Appellant was, through no fault of his own, not physically, or financially able to perform the duty. R.C.M. 916(i). The trial judge has a sua sponte duty to instruct on this affirmative defense when fairly raised by the evidence, even without a specific request by the defense. *Meeks*, 41 M.J. at 153.

### 3. Analysis

Through appellant's defense counsel, Appellant specifically avers that his disobeying orders and dereliction of duty convictions are factually insufficient and two of his dereliction of duty convictions are legally insufficient. Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), Appellant personally avers that his assault convictions are legally insufficient.

### a. Duties to Out-Process, 4 April 2022 – 11 May 2022

Appellant avers his conviction for willfully failing to out-process is factually insufficient due to a lack of understanding of this duty, and "weak" evidence. We find Appellant has made the requisite specific showing of a deficiency of proof and we weigh the evidence with the appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence. In early April

21

2022, MSgt AM informed Appellant his discharge orders had arrived, and ensured Appellant was given a copy. MSgt AM further ensured Appellant had an out-processing checklist. From 4 April 2022 through 11 May 2022, on at least five occasions in a period of over 30 days, Appellant intentionally failed to complete the requirements to out-process. Without MSgt AM's assistance, Appellant would not have been authorized to depart Japan, as ordered. We are convinced that the finding of guilty was in accordance with the weight of the evidence. This conviction is factually sufficient.

### b. Duty to Board Flight JL154, 12 May 2022

Appellant avers his conviction for negligently failing to board Flight JL154 on 12 May 2022 was both legally and factually insufficient. On 12 May 2022, Appellant had a duty to board his departure flight, however the evidence reflects that instead of Flight JL154, Appellant's duty was to board Flight JL156.

The Government charged dereliction of duty by failing to board a specific flight number and then failed to prove that flight number. Therefore, the Government failed to prove the first element of this offense and it is legally insufficient. We find this conviction is also factually insufficient for the same reason, as we are clearly convinced that the finding of guilty was against the weight of the evidence.

### c. Duty to Board Flight V272 and Other Events, 17 May 2022

Appellant avers his conviction for willfully failing to board Flight V272 on 17 May 2022 was both legally and factually insufficient. Appellant supports these claims by offering the Government failed to prove the correct flight number, and because compliance was "impossible." For our factual sufficiency review, we find Appellant has made the requisite specific showing of a deficiency of proof and we weigh the evidence with the appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence.

On 17 May 2022, after breakfast, SrA DC, MSgt AM, and MSgt MH all offered to help Appellant finish packing up his belongings and all offered to take Appellant to the airport in separate invitations. Appellant declined. Knowing the report no later than time was expiring, MSgt AM sought support from Appellant's commander, Lt Col CT. Lt Col CT and MSgt AM then went to Appellant's dorm room. The time was after 1100. Appellant answered the door; and Lt Col CT, in a "fatherly" tone, and MSgt AM, eventually with a stern voice, directed Appellant to finish packing his belongings, and get to the Misawa AB passenger terminal. This conversation was video recorded by a security camera. Although there is no sound, Lt Col CT and MSgt AM are visibly speaking in front of Appellant, who is not visible on camera, standing inside the threshold of his room. According to Lt Col CT and MSgt AM, Appellant became agitated with the directions, said "not to worry, I'll be a foreigner

tomorrow" and then slammed his door shut. Through his words, and actions, Appellant demonstrated an intentional defiance to Lt Col CT's lawful command.

We have carefully considered Appellant's arguments, as well as the duty of the trial judge to instruct on the affirmative defense of inability, even without a specific request from the Defense at trial, when fairly raised by the evidence. *Meeks*, 41 M.J. at 153. We find the affirmative defense of inability, or impossibility, was not fairly raised by the evidence at trial. The crime of willfully failing to board Flight V272 was completed by 1100, by the time Appellant slammed his dorm room door shut, while his commander, Lt Col CT, and his first sergeant, MSgt AM, were standing in front of him. As to the flight number, the Government admitted PE 5, which included the flight number, inside the mission number, TKCV2720A137. After viewing the evidence in the light most favorable to the Government, we find a rational trier of fact could have found the essential elements of this crime beyond a reasonable doubt. *Robinson*, 77 M.J. at 297–98. Additionally, we are convinced that the finding of guilty was in accordance with the weight of the evidence. Therefore, the conviction for willfully failing to board Flight V272 is both legally and factually sufficient.

Appellant avers his conviction for willfully disobeying Lt Col CT's order to "pack his bags and go to the Misawa Air Base Terminal" is factually insufficient because compliance was impossible. Appellant claims he was detained and therefore could not pack his bags and go to the terminal. For our factual sufficiency review, we find Appellant has made the requisite specific showing of a deficiency of proof and we weigh the evidence with the appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence. Our analysis here is the same as above; the crime of willfully disobeying his commander's order was completed by 1100 on 17 May 2022. Any detention that may have occurred later in the day did not prevent Appellant from obeying Lt Col CT's order. Any detention that may have occurred was not admitted as evidence before the members. Additionally, there was no evidence admitted at trial that there was any other reason why Appellant willfully disobeyed his commander's lawful direction. We are convinced that the finding of guilty for willfully disobeying Lt Col CT's order to "pack his bags and go to the Misawa Air Base Terminal" was in accordance with the weight of the evidence, namely the testimony of Lt Col CT, MSgt AM, and admission of PE 5. This conviction is factually sufficient.

Appellant personally avers his assault convictions are not legally sufficient. *Grostefon*, 12 M.J. at 431. Appellant opened his door, with an extended pocketknife in his right hand. He saw the direction his commander and first sergeant were running in, and he chased them. Each of the six video clips clearly show Appellant sprinting after his leadership with the knife extended in his

right hand. At the end of the sixth clip, the camera captures Appellant stopping outside the exit door and tossing the knife between his hands while he is looking for his commander and first sergeant. The knife was lawfully seized by responding security forces members and admitted into evidence at trial.

Appellant claims he was suffering from a lack of mental responsibility. We have carefully considered Appellant's argument and the affirmative defense of lack of mental responsibility. The record is void of evidence of a severe mental disease or defect, such that Appellant was unable to appreciate the nature and quality or the wrongfulness of the acts. Without a "severe" mental disease or defect, lack of mental responsibility does not otherwise constitute a defense. Article 50a(a), UCMJ.

Viewing the evidence in the light most favorable to the Government, we conclude the court members rationally found the essential elements of Appellant's assault crimes beyond a reasonable doubt. *Robinson*, 77 M.J. at 297–98.

**D. Post-Trial Delay**

**1. Additional Background**

Appellant was sentenced on 28 October 2022. Initially, Appellant's record of trial was docketed with the court on 8 June 2023, 223 days after Appellant was sentenced. Appellant then moved for eight enlargements of time to file his assignments of error brief. The Government opposed the motions. The court granted each one.

On 9 April 2024, in response to Appellant's unopposed motion to remand his case for correction under R.C.M. 1112(d), we ordered remand to account for missing portions of the verbatim transcript and missing documents from the record of trial. *United States v. Howard*, No. ACM 40478, 2024 CCA LEXIS 137, at *3 (A.F. Ct. Crim. App. 9 Apr. 2024) (order).

On 22 May 2024, the trial judge issued a certificate of correction ensuring a substantially verbatim record of proceedings and attaching the missing documents to the record of trial. The record was returned to the court and Appellant's case was docketed anew on 13 June 2024. Appellant then moved for one enlargement of time, which was opposed by the Government. The court granted the motion. In Appellant's motion for an enlargement of time, dated 2 August 2024, for the first time, Appellant demanded speedy appellate review.

On 29 September 2024, Appellant filed his assignments of error to the court and served them upon the Government.

On 29 October 2024, in response to Appellant's allegation of error for post-trial delay, the Government moved to attach a declaration from MSgt ST, the installation law office superintendent, providing some information related to the shipping of the record of trial in May and June 2023. We granted that

motion to attach and consider it here. *See United States v. Jessie*, 79 M.J. 437, 445 (C.A.A.F. 2020).

### 2. Law

We review de novo whether an appellant is entitled to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) identified thresholds for facially unreasonable delay during three particular segments of the post-trial and appellate process. 63 M.J. at 141–43 (citations and footnotes omitted). Specifically, our superior court established a presumption of facially unreasonable delay where: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the CCA within 30 days of the convening authority's action, or (3) the CCA did not render a decision within 18 months of docketing. *Id.* at 142.

In *Livak*, this court recognized that "the specific requirement in *Moreno* which called for docketing to occur within 30 days of action no longer helps us determine an unreasonable delay under the new procedural rules." 80 M.J. at 633. Accordingly, this court established an aggregated sentence-to-docketing 150-day threshold for facially unreasonable delay in cases that were referred to trial on or after 1 January 2019. *Id.* (citation omitted).

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). In *Barker*, the Supreme Court also identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations and footnotes omitted). "Of those, the most serious is the last [type], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Additionally, where an appellant has not shown prejudice from the delay, we cannot find a due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Independent of any due process violation, this court may provide appropriate relief where there is "excessive delay in the processing of the court-martial

after the judgment was entered into the record." *United States v. Valentin-Andino*, 85 M.J. 361, 364 (C.A.A.F. 2025) (citing Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2)).

If a CCA decides relief is warranted for excessive post-trial delay under Article 66(d)(2), UCMJ, "that relief must be 'appropriate,' meaning it must be suitable considering the facts and circumstances surrounding that case." *Id.* at 367. "This does not require a [CCA] to provide relief that is objectively meaningful, and it does not obligate a [CCA] to explain its reasoning regarding the relief it does provide." *Id.*

**3. Analysis**

Appellant avers he is entitled to sentence relief because of the 223-day delay between announcement of sentence and the original docketing with the court. Appellee agrees with the calculation of days between Appellant's sentence and docketing with the court, although the Government disagrees that sentence relief is warranted. Therefore, the 223 days the Government took to docket Appellant's case presents a facially unreasonable delay by 73 days. We analyze the *Barker* factors to determine whether a due process violation occurred.

According to a chronology included in the record, after the fully litigated trial with members concluded on 28 October 2022, the court reporter began transcription in this case on 7 December 2022, 40 days later. Before the transcription began in Appellant's case, the court reporter was assigned to multiple courts-martial and discharge board hearings held at various locations. Even after the court reporter began transcribing Appellant's proceedings, between 20 January 2023 and 11 February 2023, the court reporter was assigned to additional courts-martial and discharge boards held at other locations. On 1 March 2023, the court reporter identified areas in Appellant's transcript that required additional attention. On 27 March 2023, while comparing the transcript to the audio recording of the proceedings, trial defense counsel discovered areas in the transcript for editing—all the while, the record was being assembled. On 24 April 2023 the case paralegal requested a review of the master index due to the number of edits made to the transcript. Between 25 April 2023 and 1 May 2023, the case paralegal, counsel for both parties, and the court reporter were finalizing edits to the transcript. On 2 May 2023, the counsel for the parties and the court reporter signed the certification of the transcript.

On 5 May 2023, the installation legal office mailed via United States Postal Service the record of trial to the legal office of the GCMCA for their review and forwarding. On 7 June 2023, the record of trial was received by the Air Force

Military Justice Appellate Records Branch. On 8 June 2023, Appellant's case was originally docketed with the court.

Here, the length of delay is presumptively unreasonable, but not particularly egregious given the numerous obligations imposed upon the court reporter. The reasons for the delay weigh in favor of Appellant, but only slightly. Additionally, only after eight granted enlargements of time, a remand requested by Appellant, a re-docketed appeal, and an additional request for enlargement of time, did Appellant make a demand for speedy appellate review. Appellant did not demand speedy trial during the 223-day docketing delay, and not until 644 days after his sentence. This factor weighs in favor of the Government.

In his brief, Appellant claims the 223-day docketing delay necessitated the addition of appellate defense counsel, and that this caused Appellant prejudice. Without significantly more details or context, we are not persuaded Appellant suffered prejudice for this reason. This weighs in favor of the Government. Evaluating all the factors, we do not find a due process violation.

Appellant urges us to utilize our statutory authority to grant relief for the post-trial delay. We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, in the absence of a due process violation. Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(d), UCMJ, authority to grant relief.

## E. Sentence Reassessment

### 1. Law

Under Article 59(a), UCMJ, 10 U.S.C. § 859(a), a court-martial sentence may not be held incorrect by virtue of legal error "unless the error materially prejudices the substantial rights of the accused." If we can conclude that absent any error, an adjudged sentence would have been at least a certain severity, "then a sentence of that severity or less will be free of the prejudicial effects of error; and the demands of Article 59(a)[, UCMJ,] will be met." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances, and the following illustrative factors announced in *Winckelmann*: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant

to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the [CCAs] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted).

We may reassess a sentence only if we are able to reliably determine that, absent the error, the "sentence would have been at least of a certain magnitude." *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000) (citation omitted).

### 2. Analysis

Having considered the totality of the circumstances, including the *Winckelmann* factors, we are convinced that we can reliably reassess the sentence. First, there has not been a dramatic change in the penalty landscape or exposure. In response to trial defense counsel's motion, the trial judge merged for sentencing purposes the two convictions of assaulting a superior commissioned officer by lifting up a weapon against Lt Col CT, and assaulting MSgt AM by chasing him with a knife. The maximum sentence for confinement of all the convictions was 16 years and three months. Dismissing the negligent dereliction of duty reduces the maximum sentence for confinement by three months. The rest of the maximum sentence parameters remain the same. This change is not dramatic and favors reassessment.

Second, Appellant was sentenced by members and therefore, we do not have segmented sentencing to review. This factor weighs in favor of a rehearing. Third, the remaining offenses capture the gravamen of Appellant's criminal conduct from the original convictions. The gravamen of Appellant's criminal conduct are the assaults committed against Lt Col CT and MSgt AM. Fourth, the remaining offenses are for types of offenses with which the judges of this court have experience and familiarity. Both these factors weigh in favor of reassessment.

We may reassess a sentence only if we are able to reliably determine that, absent the error, the sentence would have been "at least of a certain magnitude." *Harris*, 53 M.J. at 88 (citation omitted). Having considered the totality of the circumstances, and applied the *Winckelmann* factors, we can reliably make such a determination. We are convinced the sentence would have been at least the same as originally imposed: a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1.

### III. CONCLUSION

The finding of guilty as to Specification 2 of Charge V is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. We reassess Appellant's sentence to a dishonorable discharge, confinement for six years, forfeiture of all pay and

allowances, and reduction to the grade of E-1. The findings of guilty as to the Specification of Charge II and Charge II, and Specification 1 of Charge IV and Charge IV, are correct in law. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d) (2024 *MCM*). The Specification of Charge III and Charge III, and Specifications 1 and 3 of Charge V and Charge V, are correct in law and fact. Articles 59(a) and 66(d), UCMJ (2024 *MCM*). The sentence, as reassessed, is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). The remaining findings, and the sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court